In the Matter of COLLEGE OF NEW ROCHELLE, Respondent-Appellant, *v.* EWALD B. NYQUIST, as Commissioner of Education of the State of New York, Appellant-Respondent.

Third Department, December 13, 1971.

*Muldoon & Horgan* (*Charles S. Horgan* of counsel), for respondent-appellant.

*Robert D. Stone* (*John P. Jehu* of counsel), for appellant-respondent.

GREENBLOTT, J. These are cross appeals from a judgment of the Supreme Court at Special Term, entered September 4, 1970 in Albany County, in a proceeding under article 78 of the CPLR, which set aside a determination by respondent Commissioner of Education that petitioner was not eligible for State aid pursuant to section 6401 of the Education Law and remanded the matter to the respondent for further proceedings.

Article 129 of the Education Law, which consists of section 6401, was enacted by chapter 677 of the Laws of 1968. It provides, *inter alia,* that the Commissioner of Education is authorized to apportion and to pay for each annual period commencing July 1, 1969 amounts of State aid to any private institution of higher learning within the State which meets the requirements of the section. Subsequent to the enactment of article 129 the Commissioner of Education sent a memorandum to the chief executive officers of all institutions of higher education in the State authorized to confer the baccalaureate or higher degree requesting each, if it intended to apply for State aid pursuant to article 129, to provide information concerning the purposes, policies and governance of the institution, and concerning its

faculty, student body, curricula and programs. The purpose was stated in the memorandum to be to aid the Commissioner in determining the eligibility of the institution for such funds. The memorandum, which set forth the significant constitutional provisions, requested answers to 13 relevant questions and stated that each institution was free to submit whatever further information it considered pertinent to the determination of its eligibility to receive State aid.

The College of New Rochelle, in response to the memorandum, submitted a statement together with other information to support its position. After reviewing this, the Commissioner tentatively determined that the college was ineligible for State aid and addressed a letter to the president of the college informing her of said determination and suggesting that, before a final determination be made, representatives of the college meet with the Commissioner's staff to insure that his information was complete, current and accurate. A conference was held at which the college was represented by its then president, Sister Mary Robert Falls, the dean of faculty, a trustee, an instructor in religious studies and the general counsel of the college. After reviewing all of the information provided, the Commissioner made a final determination that the college was "not eligible for State aid under the relevant provisions of the New York State Constitution". This conclusion was "based not on any single factor, but rather upon my understanding of the institution as a whole".

The college thereafter instituted this article 78 proceeding to obtain a judgment annulling and setting aside the Commissioner's determination. Special Term, concluding that there was an apparent failure of factual development and that it could not, therefore, make a determination of any question of law presented, set aside the determination and remanded the matter to the Commissioner for further proceedings. The Commissioner has appealed this determination and the College of New Rochelle has cross-appealed from that part of the determination which remanded the matter for further proceedings.

Several contentions are presented by the parties and each will be treated as necessitated by the determination of the issues presented. The first is the college's contention that it was not accorded a hearing as mandated by standards of fairness and due process. The Commissioner's determination, made pursuant to the authority delegated to him by the Legislature, is best characterized as an "administrative" decision as opposed to a "judicial" or "quasi-judicial" one. Since the decision was

administrative in nature, no adversary hearing need be held nor may a due process objection to the procedure followed be made; it is required only that the determination have a rational basis. (8 Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 7803.04, 7803.07, 7803.12, 7803.13; *Matter of Canisius Coll. of Buffalo* v. *Nyquist,* 36 A D 2d 340, 342; *Matter of Iona Coll.* v. *Nyquist,* 65 Misc 2d 329; see, also, *Matter of Older* v. *Board of Educ. of Union Free School Dist. No. 1, Town of Mamaroneck,* 27 N Y 2d 333 and HERLIHY, P. J., concurring in the result in *Matter of Canisius Coll. of Buffalo* v. *Nyquist, supra,* p. 346.) The procedure employed by the Commissioner pursuant to the mandate of subdivision 5 of section 6401 (section 6401 does not require a hearing) in making his administrative decision did not only have a rational basis, it was also reasonable and "fair" (see *Matter of Canisius Coll. of Buffalo* v. *Nyquist, supra; Matter of Iona Coll.* v. *Nyquist, supra*). The college was invited, as were all such colleges, to provide answers to a pertinent questionnaire concerning the purposes, policies and governance of the college as well as its faculty, student body, curricula and programs. The questions were to be answered so as to provide information from which eligibility for State aid could be determined and, moreover, the questionnaire requested whatever additional information the college considered relevant to the determination. Further, after informing the college of its tentative denial, the Commissioner invited representatives of the college to meet with his staff to determine whether all his information was current, complete and accurate. Such a meeting was held and the college supplied additional information which was reviewed by the Commissioner prior to his final determination.

Having determined that the procedure followed by the Commissioner was reasonable and not arbitrary, we now turn to the issue of whether or not the Constitution of the State of New York prohibits State aid to petitioner as provided by section 6401.

Paragraph d of subdivision 2 of section 6401 of the Education Law provides that to qualify for State aid "the institution must be eligible for state aid under the provisions of the constitution of the United States and the constitution of the state of New York". Section 3 of article XI of the State Constitution — commonly referred to as the Blaine Amendment — provides that the State shall not use or permit to be used public moneys in aid "of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught". Since this case has reached us by means of an article 78 proceed-

ing seeking review of the Commissioner's determination, the precise issue before us is whether the Commissioner's determination that the College of New Rochelle was prohibited by the Blaine Amendment from receiving State aid pursuant to section 6401 of the Education Law was purely arbitrary (see *Matter of Canisius Coll. of Buffalo* v. *Nyquist*, 36 A D 2d 340, *supra;* see, also, *Matter of Board of Educ. of City of N. Y.* v. *Allen*, 6 N Y 2d 127, 136; *Matter of Lubell* v. *Nyquist*, 31 A D 2d 569, mot. for lv. to app. den. 23 N Y 2d 645).

The Blaine Amendment contains two operative clauses: (1) " any school or institution of learning wholly or in part under the control or direction of any religious denomination "; and (2) any school or institution " in which any denominational tenet or doctrine is taught ". Either one of these may effectively proscribe the granting of State aid to an institution otherwise eligible for such aid. The second clause was recently construed by this court in *Matter of Canisius Coll. of Buffalo* v. *Nyquist* (*supra*). Concluding that the college did not teach a religious doctrine in the " Blaine Amendment sense of indoctrination ", we stated (p. 344): " It is agreed that most, if not all, institutions of higher learning in New York State offer courses in religion, and it is conceded that State aid under section 6401 has been approved for such institutions. To literally interpret the provision of the Blaine Amendment that ' any   *   *   *   institution   *   *   *   in which *any* denominational tenet or doctrine is taught ' is prohibited from State aid, would be absurd, since it would eliminate from State aid almost all private institutions, as well as some of the schools of the State University. The reasonable interpretation of this portion of the Blaine Amendment is that State aid should not be given to institutions which teach tenets as doctrine of a particular religious denomination to the exclusion of other denominations."

Under this interpretation, petitioner here is not proscribed from receiving State aid. The College of New Rochelle, like Canisius College of Buffalo, cannot be said to teach a doctrine of a particular religious denomination to the exclusion of other denominations. Although a certain number of credits of religious studies are required to be taken, they are not excessive. Nor are they courses of instruction of the type sought to be encompassed by the Blaine Amendment. Rather, they are courses of the type taught in any private and State institutions of higher learning; ones which seek as an academic discipline the sources and development of the Judaeo-Christian tradition and the religious heritage of the world. The faculty of the

department includes laymen, rabbis, a Protestant clergyman, an Orthodox priest, and a Catholic priest as well as several members of the sponsoring religious order. Nor is a denominational tenet or doctrine "taught" outside the classroom. Although various opportunities are offered both daily and intermittently throughout the year so that the students and faculty may participate in prayer together and although members of the sponsoring order are noticeable at the college, this is not sufficient so as to conclude that a denominational tenet or doctrine is taught to a degree sufficient to proscribe State aid. To reason otherwise could well lead to the elimination of State aid from practically all institutions of higher learning affiliated with a sponsoring religious order (see *Matter of Canisius Coll. of Buffalo* v. *Nyquist, supra,* p. 343).

We next must determine whether the granting of State aid to the College of New Rochelle could have been proscribed by that part (the first clause) of the Blaine Amendment which states that aid is not permitted where an institution is wholly or in part under the control or direction of a religious denomination. It could easily be said that the College of New Rochelle, being an institution of higher learning sponsored by a religious order, is, of necessity, under the direction (if not the control) of such religious order and therefore is under the direction or control of a religious denomination. This simplistic type of reasoning has, however, long been rejected (*Tilton* v. *Richardson,* 403 U. S. 672, 678–679; see *Board of Educ.* v. *Allen,* 392 U. S. 236, affg. 20 N Y 2d 109). A deeper analysis is necessary. To make sense of and to give purpose to this clause of the Blaine Amendment it must be construed to proscribe State aid where the affiliated religious denomination controls or directs the institution towards a religious end; where the institution is controlled or directed to a degree so as to enable the religious authorities to propagate and advance — or at least attempt to do so — their religion. Mere affiliation or a sharing of administrative control by a denomination will not, in and of itself, bring the institution within the proscription of the statute; such a situation cannot be said to have caused religion to so "pervade" the atmosphere of the college as to effectuate religious control or direction by a religious denomination.

The College of New Rochelle was founded in 1904 by the Ursuline Nuns, an order devoted to the education of girls. It describes itself as "a liberal arts college for women under Catholic auspices" "committed to the Christian tradition in its uniqueness and complexity" and believing that "the

Christian faith is relevant to learning and life ''. The responsibility for administering the college is shared by the Community of Ursuline Nuns, who also comprise a substantial minority of the board of trustees, occupy the presidency and comprise approximately one third of the faculty. The Ursuline Nuns are not, as the Commissioner concedes, controlled by religious affiliation insofar as their professional and academic activities are concerned. They are, of course, governed in matters of faith by their religion. This is to be expected and, as noted, will not, in and of itself, bring the college within the proscription. The question is whether the college was controlled or directed by a religious denomination so as to inculcate or attempt to inculcate the doctrine and faith of the denomination. We find upon an analysis of the record, considering the totality of the circumstances, that this is not the case and for the Commissioner to so hold would be unsupportable. Therefore, since his conclusion cannot be based upon either clause of the Blaine Amendment, for him to hold that the New York State Constitution proscribed State aid to the college was arbitrary and capricious.

Although the Commissioner denied State aid to the College of New Rochelle solely on the basis that it was proscribed by the New York State Constitution, to qualify for State aid the college must also be eligible under the provisions of the United States Constitution. An analysis of the facts herein shows that State aid to the college would not result in either the advancement or inhibition of religion. Further, the statute has a secular legislative purpose and meets the purpose and primary effect standard of constitutionality; its principal effect is one that neither advances nor inhibits religion. (See *Tilton* v. *Richardson*, 403 U. S. 672, *supra*; *Lemon* v. *Kurtzman*, 403 U. S. 602; *Walz* v. *Tax Comm.*, 397 U. S. 664; *Matter of Canisius Coll. of Buffalo* v. *Nyquist*, 36 A D 2d 340, 344–346, *supra*.) As we stated in the *Canisius College* case (p. 344): '' The primary purpose of section 6401 is not to help any religious group, but to assist the private colleges in providing better quality education for its students. This is a proper secular objective which constitutes the primary purpose and effect of the legislation ''.

We next must consider the independent question of whether there is an excessive entanglement of the State with religion (see *Tilton* v. *Richardson*, *supra*, pp. 684–685; *Lemon* v. *Kurtzman*, *supra*, p. 613). Although close scrutiny of the degree of such entanglement is called for, it must be remembered that total separation is not possible; some relationship is not only inevitable, but is permissible (*Lemon* v. *Kurtzman*, *supra*, p. 614;

*Walz* v. *Tax Comm., supra*; *Zorach* v. *Clauson,* 343 U. S. 306, 312). In order to determine whether the degree of entanglement here is of a permissible amount, "we must", as Mr. Chief Justice BURGER speaking for the court in *Lemon* v. *Kurtzman* (*supra,* p. 615) said, "examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority".

In that case, which was decided together with *Earley* v. *DiCenso,* Pennsylvania and Rhode Island statutes providing State aid to church-related elementary and secondary schools were examined and held to be unconstitutional. Pennsylvania had adopted a statutory program wherein nonpublic elementary and secondary schools were aided by means of reimbursement for the cost of teachers' salaries, textbooks and instructional materials in specified secular subjects. Rhode Island's statute provided for direct payment of a supplement of 15% of their salary to teachers in nonpublic elementary schools. In discussing the Rhode Island program, the court (pp. 615–616) stated: "The church schools involved in the program are located close to parish churches. This understandably permits convenient access for religious exercises since instruction in faith and morals is part of the total educational process. The school buildings contain identifying religious symbols such as crosses on the exterior and crucifixes, religious paintings and statues either in the classrooms or hallways. Although only approximately 30 minutes a day are devoted to *direct religious instruction, there are religiously oriented extracurricular activities.* Approximately two thirds of the teachers in these schools are nuns of various religious orders. *Their dedicated efforts provide an atmosphere in which religious instruction and religious vocations are natural and proper parts of life in such schools.* Indeed, as the District Court found, the role of teaching nuns in enhancing the religious atmosphere has led the parochial school authorities to attempt to maintain a one-to-one ratio between nuns and lay teachers in all schools rather than to permit some to be staffed almost entirely by lay teachers." (Emphasis added.) And (pp. 617–618): "The Rhode Island Roman Catholic elementary schools are under the general supervision of the Bishop of Providence and his appointed representative, the Diocesan Superintendent of Schools. In most cases, each individual parish, however, assumes the ultimate financial responsibilty for the school, with the parish priest authorizing the allocation of parish funds. With only two exceptions,

school principals are nuns appointed either by the Superintendent or the Mother Provincial of the order whose members staff the school. By 1969 lay teachers constituted more than a third of all teachers in the parochial elementary schools, and their number is growing. They are first interviewed by the superintendent's office and then by the school principal. The contracts are signed by the parish priest, and he retains some discretion in negotiating salary levels. Religious authority necessarily pervades the school system.''

The Pennsylvania educational system was very similar to the one in Rhode Island, i.e., the schools were (the allegations were accepted as true since the complaint had been dismissed for failure to state a claim for relief) controlled by religious organizations having the purpose of promulgating and promoting a particular religious faith which conducted their operations to fulfill that purpose (*Lemon* v. *Kurtzman, supra,* pp. 620–621). The Pennsylvania statute had the further defect of providing the financial aid directly to the schools (*id.,* p. 621; *Walz* v. *Tax Comm.,* 397 U. S. 664, *supra*).

In *Tilton* v. *Richardson* (403 U. S. 672, *supra*), decided the same day as *Lemon* and *DiCenso,* the Supreme Court was concerned with Federal aid for church-related colleges and universities under title I of the Higher Educational Facilities Act of 1963 (77 U. S. Stat. 364, as amd.; U. S. Code, tit. 20, §§ 711–721) which provided for construction grants for buildings and facilities used exclusively for secular educational purposes. In holding the statute constitutional (except for that part providing a 20-year limitation on the religious use restrictions of the act), it was reasoned (pp. 685–687) : '' There are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The ' affirmative if not dominant policy ' of the instruction in pre-college church schools is ' to assure future adherents to a particular faith by having control of their total education at an early age.' *Walz* v. *Tax Comm'n., supra,* at 671. There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view, and Congress may well have entertained it. * * *

'' The record here would not support a conclusion that any of these four institutions departed from [the] general pattern. All four schools are governed by Catholic religious organizations, and the faculties and student bodies at each are predominantly Catholic. Nevertheless, the evidence shows that non-

Catholics were admitted as students and given faculty appointments. Not one of these four institutions requires its students to attend religious services. Although all four schools require their students to take theology courses, the parties stipulated that these courses are taught according to the academic requirements of the subject matter and the teacher's concept of professional standards. The parties also stipulated that the courses covered a range of human religious experiences and are not limited to courses about the Roman Catholic religion. The schools introduced evidence that they made no attempt to indoctrinate students or to proselytize. Indeed, some of the required theology courses at Albertus Magnus and Sacred Heart are taught by rabbis. Finally, as we have noted, these four schools subscribe to a well-established set of principles of academic freedom, and nothing in this record shows that these principles are not in fact followed. *In short, the evidence shows institutions with admittedly religious functions but whose predominant higher education mission is to provide their students with a secular education.*

"Since religious indoctrination is not a substantial purpose or activity of these church-related colleges and universities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education. This reduces the risk that government aid will in fact serve to support religious activities. Correspondingly, the necessity for intensive government surveillance is diminished and the resulting entanglements between government and religion lessened. Such inspection as may be necessary to ascertain that the facilities are devoted to secular education is minimal and indeed hardly more than the inspections that States impose over all private schools within the reach of compulsory education laws." (Footnotes omitted; emphasis added.)

Although there are factors in *Tilton* which distinguish it from the present case (e.g., we do not here have a one-time, single purpose grant), there are fewer and less significant entanglements between religion and government present here than were present in *Lemon* and *DiCenso*. Examining the cumulative profile that emerges in the instant situation convinces us that there is not here present such a degree of entanglement as would violate the First Amendment.[1] The College of New

1. In this regard, we might note that although we here have a direct monetary grant authorized by section 6401 of the Education Law, there is not that degree of governmental impregnation of religion which would cause an invalidation of the statute (see *Lemon* v. *Kurtzman, supra,* p. 621; *Walz* v. *Tax Comm., supra,* pp. 674–676; *Matter of Canisius Coll. of Buffalo* v. *Nyquist, supra*).

Rochelle is, in our view, an institution whose predominant higher education mission is to provide its students with a secular education. As such it should not have been denied State aid.

The judgment should be modified, on the law and the facts, so as to delete the third decretal paragraph which remanded the matter to the Commissioner for further proceedings, to grant the petition, and, as so modified, affirmed, with costs to the College of New Rochelle.

HERLIHY, P. J., REYNOLDS, COOKE and SWEENEY, JJ., concur.

Judgment modified, on the law and the facts, so as to delete the third decretal paragraph which remanded the matter to the Commissioner for further proceedings, and to grant the petition, and, as so modified, affirmed, with costs to the College of New Rochelle.

