[647 NYS2d 565]

LOUIS GRUMET et al., Appellants, v MARIO CUOMO, as Governor
of the State of New York, et al., Respondents.

Third Department, August 26, 1996

### APPEARANCES OF COUNSEL

*Jay Worona* and *Pilar Sokol,* Albany, for Louis Grumet and another, appellants.

*Dennis C. Vacco, Attorney-General,* Albany *(Julie S. Mereson* and *Daniel Smirlock* of counsel), for Mario Cuomo, respondent.

*Ingerman, Smith, Greenberg, Gross, Richmond, Heidelberger, Reich & Scricca,* Northport *(Lawrence W. Reich* of counsel), for Board of Education of Monroe-Woodbury, respondent.

*George H. Barber,* Albany, for Kiryas Joel Board of Education, respondent.

*Covington & Burling,* Washington, D.C. *(David B. Isbell* and *Michael L. Rosenthal* of counsel), for National Committee for Public Education & Religious Liberty, *amicus curiae.*

*Marc D. Stern,* New York City, for The American Jewish Congress, *amicus curiae.*

*Donna M. C. Giliberto,* Albany, for New York State Conference of Mayors and Municipal Officials, *amicus curiae.*

*George Shebitz & Associates, P. C.,* New York City *(George Shebitz, Nahal Motamed* and *Julia Cohen* of counsel), for Kiryas Joel Parent Teacher Association, *amicus curiae.*

### OPINION OF THE COURT

MERCURE, J.

### I

The Village of Kiryas Joel (hereinafter Village) in Orange County is a religious enclave of Satmar Hassidim, practitioners of a strict form of Judaism. The boundaries of the Village were intentionally drawn in such a way as to exclude all but Satmars. Living a purposely insular existence, the Satmars have adopted distinctive dress, have no radios or televisions and eschew spoken and written English in favor of Yiddish, their principal language. They also practice separation of the sexes outside of the home and, as part of an effort to avoid acculturation and to provide the Satmar boys and girls with education and training appropriate to their distinctive lifestyle, generally send their children to separate private religious schools, the United Talmudic Academy for boys and Bais Rochel for girls. The problem of educating their handicapped children, however, has thrust the Satmars into the mainstream of New York's political and judicial affairs.

The Village is situated entirely within the Monroe-Woodbury Central School District. In 1984, as an accommodation to the

distinct needs of the Satmars' handicapped children, who are affected not only by their physical or mental problems but also by their language and social and cultural background, Monroe-Woodbury's Board of Education agreed to provide various services and programs at a "neutral site" within the Village, at an annex to Bais Rochel, under the auspices of the United Talmudic Academy (*see, Board of Educ. v Wieder*, 72 NY2d 174, 178-180). These arrangements were terminated a year later, however, in reaction to the decisions of the United States Supreme Court in *Aguilar v Felton* (473 US 402) and *Grand Rapids School Dist. v Ball* (473 US 373). Although some of the handicapped Satmar children thereafter attended special education classes at the Monroe-Woodbury public schools, all but a few simply went without special educational services (*see, Board of Educ. v Wieder, supra*, at 181). The irreconcilable views of the Satmars, taking the position that the school district was required to provide special services for their handicapped children within their private religious schools, and of the school district, believing that it could furnish services only in its public schools, led to an initial round of litigation commenced by the school district in November 1985. Ultimately, that action worked its way to the Court of Appeals, which in 1988 rejected both points of view, concluding that, although the school district may legally provide services to the Satmar children outside the regular classes and programs of its public schools, it is not compelled by law to offer such services at a neutral site or in the classes and programs of the Satmars' nonpublic schools (*supra*, at 189-190).

The following year, in "an effort to resolve a longstanding conflict between the Monroe-Woodbury School District and the village of Kiryas Joel, whose population are all members of the same religious sect" (Governor's Approval Mem, 1989 NY Legis Ann, at 324), the Legislature enacted chapter 748 of the Laws of 1989 (hereinafter the prior law), which created a separate public school district in and for the Village and established a board of education, composed of five members elected by the voters of the Village. Although enjoying plenary legal authority over the elementary and secondary education of all school-aged children in the Village, the Kiryas Joel Village School District in fact ran only a special education program for handicapped children, with a mere 13 Village residents attending on a full-time basis.

Plaintiffs in the present action, Louis Grumet and Albert W. Hawk, brought an action seeking a judgment declaring the

prior law unconstitutional. Ultimately, the United States Supreme Court upheld the determination of the State courts that the legislative enactment was violative of the Establishment Clause of the First Amendment of the US Constitution (*Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet*, 512 US 687, *affg* 81 NY2d 518 [hereinafter *Kiryas Joel I*]). The Court opined that, although the Constitution allows the State to accommodate religious needs by alleviating special burdens, the prior law "crosse[d] the line from permissible accommodation to impermissible establishment" (512 US, *supra*, at 710). Notably, "[t]he fact that this school district was created by a special and unusual Act of the legislature * * * gives reason for concern whether the benefit received by the Satmar community is one that the legislature will provide equally to other religious (and nonreligious) groups * * * [t]he fundamental source of constitutional concern [being] that the legislature itself may fail to exercise governmental authority in a religiously neutral way" (512 US, *supra*, at 702-703). "Because the religious community of Kiryas Joel did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law, [the Court had] no assurance that the next similarly situated group seeking a school district of its own will receive one" (512 US, *supra*, at 703).

In a concurring opinion, Justice O'Connor provided New York with some guidelines for crafting acceptable legislation, stating: "There is nothing improper about a legislative intention to accommodate a religious group, so long as it is implemented through generally applicable legislation. New York may, for instance, allow all villages to operate their own school districts. If it does not want to act so broadly, *it may set forth neutral criteria that a village must meet to have a school district of its own*; these criteria can then be applied by a state agency, and the decision would then be reviewable by the judiciary. A district created under a generally applicable scheme would be acceptable even though it coincides with a village which was consciously created by its voters as an enclave for their religious group. I do not think the Court's opinion holds the contrary" (512 US, *supra*, at 717 [O'Connor, J., concurring] [emphasis supplied]).

A mere 11 days after the United States Supreme Court issued its decision in *Kiryas Joel I*, the Legislature and then-Governor defendant Mario Cuomo accepted Justice O'Connor's

invitation by simultaneously passing and signing into law chapters 279 and 241 of the Laws of 1994 (hereinafter the current law). Laws of 1994 (ch 279) repealed the prior law, but allowed the Kiryas Joel Village School District to continue until the State court issued a mandate implementing *Kiryas Joel I* or until the school district was reconstituted (*see*, L 1994, ch 279, § 3). The current law amended Education Law article 31 by adding provisions that would allow municipalities existing on the effective date to establish their own union free school districts without the need for special legislation if they exhibit the following demographic features: (1) the municipality is situated wholly within a single central or union free school district, but its boundaries are not coterminous with the boundaries of the school district, (2) the enrollment of the municipality equals at least 2,000 children and is no greater than 60% of the enrollment of the existing school district, (3) the new school district will have an actual valuation per total wealth pupil unit at least equal to the State-wide average, (4) the enrollment of the existing school district will be at least 2,000 students exclusive of the residents of the qualifying municipality, and (5) the actual valuation per total wealth pupil unit of the existing school district will not increase or decrease by more than 10% following organization of the new school district (L 1994, ch 241, § 1, adding Education Law § 1504 [3]). In accordance with the provisions of the current law, Monroe-Woodbury and the residents of the Village each voted to approve the Village's establishment of its own school district.

Plaintiffs then commenced the present action, seeking a declaration that the current law is unconstitutional upon the essential theory that it constitutes a de facto reenactment of the prior law. On cross motions for summary judgment, Supreme Court made a detailed analysis of the current law under the test propounded in *Lemon v Kurtzman* (403 US 602) and NY Constitution, article XI, § 3, concluded that the current law is constitutional as a matter of law and dismissed the complaint. Plaintiffs now appeal.

## II

We begin our analysis with the simple proposition that New York may not, consistent with the Establishment Clause of the 1st Amendment of the US Constitution, enact special legislation creating a school district coterminous with the Village. In order to reach that conclusion, we need not analyze the reasoning underlying the decision in *Kiryas Joel I (supra)*, explore the

past, present or future applicability of the *Lemon* test, or engage in any detailed legal discourse. To the contrary, that issue was decided in *Kiryas Joel I* when the New York courts and the United States Supreme Court struck down the prior law as violative of the United States Constitution. In this case, the only question that need be considered is whether, in enacting the current law, the Legislature simply resurrected the prior law by achieving exactly the same result through carefully crafted indirect means. We believe that it has.

As earlier noted, the current law was enacted and signed into law only 11 days after the United States Supreme Court issued its decision in *Kiryas Joel I*. Neither its key legislative sponsors nor Governor Cuomo made any secret of the fact that the law was targeted at the Village. In fact, the media quoted a spokesperson for Assembly Speaker Sheldon Silver as stating that "[t]he trick for negotiators [was] to craft legislation so Kiryas Joel would be virtually the only village to take advantage of the opportunity to create a district—even though others technically could". It appears that the Legislature did its job well. Analysis of census data and other public records establishes that the current law's demographic criteria permit only one of the State's 1,546 existing municipalities to qualify for its special treatment, the Village of Kiryas Joel. In addition, expert analysis of the statutory criteria shows them to further no known educational purpose and, as noted in *Kiryas Joel I*, the current law goes against New York's established trend of consolidating school districts, not fragmenting them (*Kiryas Joel I*, 512 US 687, 700, *supra*). Nonetheless, citing to the facial neutrality of the individual criteria, the opinion that some other municipality *may* in the future qualify and the fact that the current law is not self-executing, i.e., it requires the initiative and affirmative vote of the affected municipality and school district, defendants contend that the current law constitutes generally applicable legislation setting forth neutral criteria under which a municipality may have a school district of its own (*see*, 512 US, *supra*, at 700 [O'Connor, J., concurring]). We disagree.

It should be noted first that defendants Board of Education of the Kiryas Joel Village School District and Board of Education of the Monroe-Woodbury Central School District fought *Kiryas Joel I* all the way to the United States Supreme Court, thereby providing notice to the Legislature that, given the opportunity, both the singular eligible municipality and the school district surrounding it would vote in favor of decentrali-

zation. Under the circumstances, we view the current law's dual-approval requirement as meaningless. In fact, to the extent that a municipality may at some future time satisfy the complex statutory criteria but nonetheless fail to secure the necessary municipal or school district approval, the approval requirement may be viewed as but a further means of limiting the possible range of qualifying municipalities.

We are similarly unimpressed with defendants' claim of facial neutrality, buttressed by evidence of the *possibility* that another municipality may at some time become eligible. Fundamentally, "[t]he Constitution 'nullifies sophisticated as well as simple-minded modes' of infringing on Constitutional protections" (*U.S. Term Limits v Thornton*, 514 US —, —, 115 S Ct 1842, 1867, quoting *Lane v Wilson*, 307 US 268, 275) and will not countenance indirect attempts to accomplish what cannot be accomplished directly (*see, U.S. Term Limits v Thornton, supra*; *Wallace v Jaffree*, 472 US 38, 64-65 [Powell, J., concurring]). In determining whether the current law is a mere subterfuge, we may probe beneath its veneer of neutrality and consider the purpose for its enactment, as illuminated by historical context and the sequence of events leading to its passage, and its actual reach (*see, supra*; *Edwards v Aguillard*, 482 US 578, 595). As already noted, defendants as much as concede that the current law was enacted to fulfill the purpose underlying the prior law, i.e., to solve the unique problem associated with providing special education services to handicapped children in the Village (*Kiryas Joel I*, 512 US 687, 693-694, *supra*). Even absent a concession, the Legislature's and Governor's expressions of intent to aid the Satmars, the timing of the legislation and the content of its companion legislation (L 1994, ch 279), which continued the Kiryas Joel Village School District pending reconstitution, permit no serious question on the issue.

As for the practical effect of the law, it should suffice to note that the current law brings about precisely the same result as the prior law, the creation of a special school district for the Village of Kiryas Joel and no other municipality in the State. Despite the facial neutrality of the current law's five demographic factors, expert analysis shows them to fulfill no existing educational policy or purpose. To the contrary, they "serve only to designate and identify the place to be affected * * * creat[ing] a purported class in name only" (*Matter of Radich v Council of City of Lackawanna*, 93 AD2d 559, 564-565, *affd* 61 NY2d 652). As cogently argued in the amicus brief submitted

on behalf of The American Jewish Congress concerning the passage of the current law by both houses of the Legislature on the very day it was introduced: "A legislature that is annually paralyzed over the allocation of state funds between rural and urban districts, for example, does not decide in one day that the whole of New York's educational system needs revamping. The New York legislature did not decide in one day that for legitimate reasons of educational policy the decades-old state policy of consolidating smaller districts into fiscally and educationally more efficient larger districts * * * was unsound or needed substantial modification. No committee of the Assembly or the Senate had urged such a change. Neither had the Regents, the Commissioner of Education or any special task force. No newspaper, no magazine, no student of New York's education system, called for the 'reform' embodied in [the current law] [citation omitted]."

While each of the current law's five criteria standing alone might be viewed as neutral and might legitimately be given general application, when the five criteria are considered together they simply identify the Village (see, Stapleton v Pinckney, 293 NY 330, 334-336; Matter of Henneberger, 155 NY 420, 424-428; cf., Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, 368; see also, Gomillion v Lightfoot, 364 US 339). We must look beyond the current law's words, which are no more than a camouflage for the current law's true purpose (see, Church of Lukumi Babalu Aye v City of Hialeah, 508 US 520, 534).

Perhaps most illuminating is a consideration of the last of the current law's demographic factors, that the actual valuation per total wealth pupil unit of the existing school district not increase or decrease by more than 10% following reorganization of the school district, which was justified in the Governor's Program Bill Memorandum as protecting existing districts against large swings in property taxes. As pointed out by amicus curiae National Pearl, although there may be political reasons to protect existing districts against large increases in property taxes, there surely can be no logical reason to protect those districts against decreases in taxes. Nonetheless, as noted in the affidavit of Daniel Kinley, Deputy Executive Director of the State School Boards Association, absent this apparently meaningless criterion four municipalities would have

been eligible for the current law's special treatment, not just the single targeted Village.*

We cannot join in the dissent's innocent acceptance of the representation that the purpose for the current law is to fill a gap in the law by authorizing municipalities to create school districts when required by the educational interests of the community. Had that intent been genuine, the Legislature surely would not have imposed a complex series of demographic qualifiers so onerous as to limit the range of eligible municipalities to one. Nor can it be shown (or even seriously argued) that the demographic criteria selected by the Legislature have a discernible relationship to any "exceptional community circumstances" to be addressed by the current law. The "special needs" theory upon which the dissent predicates its analysis is, in a word, illusory.

Had the current law permitted any existing municipality, or even any village, to form a school district if it obtained appropriate approvals and also fulfilled statutory criteria designed to evidence a special educational need for a separate school district, we would have no quarrel. Such a law of uniform State-wide application would be analytically comparable to the general authorization of Village Law article 2 and would also fulfill Justice O'Connor's vision of "[a] district created under a generally applicable scheme * * * [merely] coincid[ing] with a village which was consciously created by its voters as an enclave for their religious group" (*Kiryas Joel I*, 512 US, *supra,* at 717 [O'Connor, J., concurring]). In sharp contrast, the current law is exposed as a subterfuge and, as with the prior law, legislation "singl[ing] out a particular religious group for favorable treatment" (512 US, *supra,* at 716 [O'Connor, J., concurring]).

Finally, we conclude our analysis by noting our agreement with Chief Judge Kaye (*see, Grumet v Board of Educ.,* 81 NY2d 518, 532-540 [Kaye, Ch. J., concurring], *affd* 512 US 687, *supra*), Justice O'Connor (*see, Kiryas Joel I,* 512 US, *supra,* at 716-717 [O'Connor, J., concurring]) and Justice Souter (512 US, *supra,* at 705) that there are a number of constitutionally permis-

---

* We note that Kinley made an alternative analysis based on defendants' argument that the 1990 census data is "faulty" and the figures should be adjusted upward 7%, resulting in the elimination of all municipalities but the targeted Village even before the fifth and final demographic factor was applied.

sible ways to accommodate the needs of the Satmars. We urge such a resolution.

SPAIN, J. (dissenting). I respectfully dissent. The challenged legislation was not designed to endorse or enhance religion, rather it provides a permissible solution to the religious/cultural dilemma faced by the people of the Village of Kiryas Joel (hereinafter Village) in meeting the needs of their handicapped children and, as such, passes Federal and State constitutional muster. The majority appears to have adopted a predominant motive analysis which suggests that once the legislative effort to accommodate the needs of those involved was found to be unconstitutional, any attempt to accomplish the same objective in some other legislative fashion is constitutionally unsound. However, a true constitutional analysis reveals that the challenged law (L 1994, chs 279, 241 [hereinafter the current law]) successfully overcomes the constitutional impediments found in the prior legislation (L 1989, ch 748 [hereinafter the prior law]) by the United States Supreme Court in *Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet* (512 US 687, *affg* 81 NY2d 518 [hereinafter *Kiryas Joel I*]). In my view the guidance provided by Justice O'Connor in *Kiryas Joel I* has been satisfied by the New York Legislature in the current law which is both generally applicable and religion neutral.

### KIRYAS JOEL I

The First Amendment of the US Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion". Known as the Establishment Clause, this amendment has been made applicable to the States by the Fourteenth Amendment. Notably, the United States Supreme Court has recognized that "the government may (and sometimes must) accommodate religious practices * * * without violating the Establishment Clause" (*Hobbie v Unemployment Appeals Commn.*, 480 US 136, 144-145; *see, Wisconsin v Yoder*, 406 US 205; *Sherbert v Verner*, 374 US 398).

In *Kiryas Joel I*, the United States Supreme Court did not utilize the *Lemon* test[1] in concluding that the prior law, which directly created the Kiryas Joel Village School District (herein-

---

1. The tripartite analysis under the Establishment Clause introduced in *Lemon v Kurtzman* (403 US 602, 612-613) requires: "First, the statute must have a secular legislative purpose; second, its principal or primary effect

after KJVSD), violated the Establishment Clause. Justice O'Connor, in her concurring opinion, observed that not every Establishment Clause case is suitable for the *Lemon* test analysis and that *Kiryas Joel I* called for a different approach because it fell into a category of cases which involve "government actions targeted at particular individuals or groups, imposing special duties or giving special benefits" (*Kiryas Joel I*, 512 US 687, 720, *supra* [O'Connor, J., concurring]).[2] The United States Supreme Court questioned the "neutrality" of the prior law, noting in *Kiryas Joel I* that "[a]uthority over public schools belongs to the State * * * and cannot be delegated to a local school district defined by the State in order to grant political control to a religious group" (512 US, *supra,* at 698).

The United States Supreme Court in *Kiryas Joel I* found the prior law to be violative of the Establishment Clause essentially on the ground that, because the Legislature passed such case-specific legislation which directly created KJVSD, there was no mechanism or opportunity for the Court to assess or assure the neutrality of the legislation, i.e., there was no way to evaluate whether the Legislature was being neutral and would adhere to the principles of neutrality by avoiding the favoring of religion over nonreligion or the favoring of one religion over other religions (*see, Grand Rapids School Dist. v Ball*, 473 US 373, 382; *Everson v Board of Educ.*, 330 US 1, 15; *see also*, Tribe, American Constitutional Law § 14-7, at 1188-1201 [2d ed]). The plurality opinion suggested a different result if KJVSD had received its authority as "one of many communities eligible for equal treatment under a general law" (*Kiryas Joel I*, 512 US, *supra,* at 720). The key infirmity in the prior law was in its singling out of the Village for preferential treatment based on its religious practices, thereby conferring a benefit on the Satmarers, a single religious sect, rather than acting in a manner neutral to religion as, for example, was accomplished with the tax exemptions in *Walz v Tax Commn.*

must be one that neither advances nor inhibits religion * * * [and third], the statute must not foster 'an excessive government entanglement with religion' " (quoting *Walz v Tax Commn.*, 397 US 664, 674).

   **2.** As observed by Supreme Court in the instant case, "the state of the Supreme Court's Establishment Clause jurisprudence appears to be in flux. * * * However, as stated by Justice White, writing for the majority in *Lamb's Chapel v Center Moriches Union Free School Dist.*, '[t]here is a proper way to inter an established decision and *Lemon*, however frightening it might be to some, has not been overruled' (508 US 384, 395, n 7)" (*Grumet v Cuomo*, 164 Misc 2d 644, 649-650).

(397 US 664, *supra*). The United States Supreme Court found the prior law to have exceeded the permissible scope of accommodation because the "special treatment" afforded this sect "extend[ed] the benefit of a special franchise" to it, thus failing to honor the command of "neutrality as among religions" (*Kiryas Joel I*, 512 US, *supra,* at 705, 707). Finally, the Court observed that the Legislature started with a village which was properly created by a religious sect and then purposely drew a school district coterminous with it in order to separate Satmarers from nonSatmarers, thereby sufficiently favoring a particular religion in violation of the Establishment Clause, i.e., it conferred State power over education to an electorate defined by its religious beliefs "in a manner that fails to foreclose religious favoritism" (512 US, *supra,* at 710).

Justice O'Connor's concurrence outlines potential permissive governmental accommodation through religion-neutral laws and suggests a cure, i.e., an accommodation "implemented through generally applicable legislation", such as allowing all villages to operate their own school districts, or setting forth "neutral criteria" that a village must meet to have its own district (512 US, *supra,* at 717 [O'Connor, J., concurring]). Justice Kennedy found no constitutional infirmity in the objective of the prior law, i.e., alleviating a burden on a group's religious practices which did not result in a consequential burden on nonadherents or impermissible favoritism toward Satmarers, but found that it was accomplished in a forbidden manner by drawing political boundaries on the basis of religion (512 US, *supra,* at 729 [Kennedy, J., concurring]). Justice Kennedy's concurrence emphasizes a key distinction between a voluntary association which leads to a political community comprised of people of one religion, such as the formation of the Village in 1977 (*see,* Village Law art 2), and the "forced separation that occurs when the government draws explicit political boundaries on the basis of peoples' faith" (*Kiryas Joel I*, 512 US, *supra,* at 730 [Kennedy, J., concurring]).

### CURRENT LAW

In the instant case, plaintiffs, supported by affidavits of experts, contend that the demographic criteria set forth in the current law are not neutral because they are crafted so that only one municipality in the State—the Village of Kiryas Joel—meets them; therefore, because the statute, by its very

terms, applies only to municipalities existing at the time of its enactment, plaintiffs argue that the current law will never apply to any municipality other than the Village unless an existing municipality evolves so as to meet these criteria.[3] In contrast, KJVSD offers the affidavit of its own expert who does not dispute the calculations of plaintiffs' experts, but demonstrates that at least one other preexisting municipality in the State presently comes very close to meeting all of the criteria enumerated in the current law, and further concludes that it is highly probable that this municipality, and others, will meet the criteria in the future.

Plaintiffs do not take issue with these conclusions. Moreover, plaintiffs do not dispute that, should other municipalities meet all of the demographic criteria and choose to create their own school districts, the delegation of authority to the boards of education of those school districts will be made irrespective of the religion of the recipients of that authority. It is significant that the general authorization found in the current law, which authorizes all qualifying municipalities to create their own school districts, is analytically comparable to the general authorization found in Village Law article 2 (a religious-neutral self-incorporation procedure) which authorized the creation of the Village. Accordingly, while it is clear that the religious preferences of the Satmarers were a part of the motivation for the creation of the current law, application of the statute is not limited, by its terms, to members of that religious group.

As further proof of their claim that the current law is not neutral, plaintiffs assert that the splintering of existing school districts runs counter to the State's general policy of consolidating school districts, a concern which was raised by the United States Supreme Court in *Kiryas Joel I* (512 US 687, 700). However, the criteria contained in the current law are facially religion-neutral and designed to protect the interests of both the new and old school districts; furthermore, the Legislature was clearly acting within its prerogative in carving out an exception to its general policy, especially where compelling

---

**3.** Notably, the Court of Appeals has held that a legislative act which affects only one institution at the time of its enactment can still qualify as general legislation, where it may well affect other members of the same class similarly situated (*see, Hotel Dorset Co. v Trust for Cultural Resources*, 46 NY2d 358).

or unusual circumstances warrant such an exception.[4]

Turning next to the United States Supreme Court's imperative, as reiterated in *Kiryas Joel I*, that a statute must contain "an 'effective means of guaranteeing' that governmental power will be and has been neutrally employed" (512 US, *supra,* at 703, quoting *Larkin v Grendel's Den*, 459 US 116, 125), plaintiffs assert that the current law's application to only preexisting municipalities provides "no assurance that the next similarly situated group seeking a school district of its own will receive one" (*Kiryas Joel I*, 512 US, *supra,* at 703). However, precisely because the current law does not apply to municipalities created after its enactment, its nonapplicability, like its applicability, is religion-neutral and, therefore, it does not offend the Establishment Clause. That is to say, were another group of Satmarers to form a village in the future meeting all other criteria of the current law, and another religious or nonreligious group did the same, neither of these new municipalities would qualify. They would be disqualified not by religion or by nonreligion, but by the neutral criterion of the date of their formation. Thus, because the current law applies, or does not apply, to municipalities irrespective of religion, it does not violate the Establishment Clause.

It is my view that by enacting the current law, a statute of general application which confers its benefit uniformly upon all qualifying municipalities, the Legislature has met the Establishment Clause concerns raised by the majority and Justice O'Connor in *Kiryas Joel I*.

## LEMON TEST

The first prong of the *Lemon* test (*Lemon v Kurtzman*, 403 US 602, *supra*), whether there is a secular purpose for the legislation, aims at preventing a government decisionmaker from abandoning neutrality and acting with the intent to promote a particular point of view in religious matters (*see, Corporation of Presiding Bishop v Amos*, 483 US 327, 335); it is

---

4. The New York State Conference of Mayors and Municipal Officials, in its *amicus* brief, argues that, as an organization representing 553 of the State's 640 cities and villages, it has a strong interest in the viability of the current law, because it expands municipal home rule by authorizing municipalities to organize new school districts whenever the educational interests of the community require it; the Conference of Mayors foresees that other qualifying municipalities may take advantage of the law in the future.

rarely at issue in cases where the education of children is involved (*see, Parents' Assn. v Quinones*, 803 F2d 1235, 1240). In order to invalidate such a statute, a court must find that its passage was wholly motivated by a religious purpose (*see, Wallace v Jaffree*, 472 US 38, 56; *see also, Bowen v Kendrick*, 487 US 589, 604, n 8; *Lynch v Donnelly*, 465 US 668, 680). The current law strives to meet the educational needs of municipalities such as the Village. Its secular purpose is apparent from the language of the statute, which filled a gap in existing law by allowing municipalities to form a new district when the educational needs of the community so warrant.[5] Clearly, the purpose of this statute is not to advance any religion; rather, its utilization by the Village allows that community a solution for the secular difficulties experienced by its handicapped children which the Satmarers' unique lifestyle has spawned. It was necessary to effect a solution here as well as in other cases in which there is a special need that the existing laws did not address.

Under the second *Lemon* prong, the "principal or primary effect [of the statute] must be one that neither advances nor inhibits religion" (*Lemon v Kurtzman*, 403 US 602, 612, *supra*). The "primary effect" inquiry has been refined by the United States Supreme Court in its subsequent opinions to assess "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an

---

5. The Governor's Memorandum states, in relevant part:

"Section 1504 of the Education Law specifically authorizes a district superintendent to organize a new school district from the territory of one or more school districts, and authorizes the district superintendents of two or more adjoining supervisory districts to form a joint school district out of the adjoining portions of their respective districts. These provisions do not, however, allow for a vote of either the school boards or the residents of the affected territories. In addition, even though there are many circumstances in which an existing political subdivision of the State may wish to form its own school district, there is no formal mechanism by which the governing body of a municipality can initiate the process toward the creation of a separate school district.

"This bill fills this gap in the law by authorizing municipalities, subject to appropriate approvals, to create school districts under certain circumstances whenever the creation of such a district is required by the educational interests of the community. Specifically, the bill adds a new section 1504 to the Education Law to authorize the creation of a new school district by any municipality situated wholly within a single central or union free school district, but whose boundaries are not coterminous with the boundaries of such school district" (Governor's Mem, Program Bill No. 323-1994, at 3, Bill Jacket, L 1994, ch 241).

endorsement, and by the nonadherents as a disapproval, of their individual religious choices" (*Grand Rapids School Dist. v Ball*, 473 US 373, 390, *supra*). The statute may not favor, prefer or promote religion (*see, Allegheny County v Greater Pittsburgh ACLU*, 492 US 573, 590-593). The primary effect of the general provisions of the current law, from which the mention of anything religious is totally absent, is on municipalities at large and is not confined to the single municipality of the Village. As Supreme Court held in this case, the effect "is the expansion of a municipality's ability to meet its local educational needs" (*Grumet v Cuomo*, 164 Misc 2d 644, 651, *supra*).

In this instance, the Village is able to meet its immediate educational needs by continuing to provide appropriate public school special education to its handicapped students. The passage of the current law in the wake of *Kiryas Joel I (supra)* is only an indication that a specific problem required a constitutionally permissible solution. This does not signify a governmental endorsement of Satmar religious precepts; rather, the Legislature merely addressed a gap in the law that failed to provide for an exceptional community circumstance, and which became apparent as the problem of educating the special needs children of the Village unfolded. Since the statutory criteria are based on conditions that can and do change, the fact that only the Village has so far formed a new district does not transform a general statute which other municipalities may use, once they qualify, into a special privilege for only the Satmar sect (*see, Hotel Dorset Co. v Trust for Cultural Resources*, 46 NY2d 358, *supra*). Furthermore, the United States Supreme Court has long recognized " 'that not every law that confers an "indirect," "remote," or "incidental" benefit upon religious institutions is, for that reason alone, constitutionally invalid' " (*Grand Rapids School Dist. v Ball, supra*, at 393; *see, Wallace v Jaffree*, 472 US 38, 70, *supra* [O'Connor, J., concurring]).

The final prong of the *Lemon* test is the proscription against fostering an excessive entanglement of the State with religion. Plaintiffs' contention, that a KJVSD school board composed entirely of members of the Satmar sect violates this prong, is without merit. Their argument is premised on the supposition that the religious leadership controls all aspects of life in the Village and, therefore, special monitoring is necessary to ensure that KJVSD's operation is not impermissibly influenced. While their religion affects how the Satmarers live, this

does not mean that they cannot also act in secular civic capacities.[6]

Moreover, there is nothing in the record to suggest nor does anyone contend that the school is operated in any manner which is inconsistent with that of any other public school, in full compliance with the Education Law and all pertinent regulations of the Education Department. The school is secular and has had no untoward interference from the religious leaders or institutions. The superintendent of the school is neither a Satmarer nor an orthodox Jew; he comes from outside the community, having worked for 20 years as an educator and administrator in New York City and has particular expertise and experience in bilingual special education. He states that defendant Board of Education and the community have been able to maintain a public school system without outside interferences. The staff comes from outside the Village and the curriculum is consistent with State regulations. KJVSD also accepts non-Satmarer students from outside the Village whose home districts place them there because they need the special services it offers. Plaintiffs have failed to establish that this school district created pursuant to the challenged legislation requires any extra monitoring by the State in order to maintain its already well-established secular operations. Accordingly, the current law survives scrutiny under all three prongs of the *Lemon* test.

### NY CONSTITUTION

Finally, plaintiffs' contention that the current law violates NY Constitution, article XI, § 3 is also without merit; they argue that because all members of KJVSD's Board of Education are members of the Satmar sect, KJVSD is under the de facto control of the sect. NY Constitution, article XI, § 3, commonly known as the Blaine Amendment, prohibits the State from, *inter alia*, using public money, or permitting it to be used, in aid "of *any school or institution of learning wholly or in part under the control or direction of any religious denomination,* or in which any denominational tenet or doctrine is

---

6. That the Village is inhabited exclusively by Satamarers does not preclude the Village's municipal exercise of its rights under generally applicable State law to act on behalf of its residents (the creation of the Village has not been challenged); furthermore, to deny the Village all the rights of a municipality because its members are all of one sect would be to discriminate on the basis of religion and deny them their Free Exercise rights rather than merely avoid Establishment Clause problems (*see, Kiryas Joel I,* 512 US, *supra,* at 699; *McDaniel v Paty,* 435 US 618).

taught" (emphasis supplied).[7] In *Matter of College of New Rochelle v Nyquist* (37 AD2d 461, 466), this Court stated that "[t]o make sense of and to give purpose to this clause of the Blaine Amendment it must be construed to proscribe State aid where the affiliated religious denomination controls or directs the institution towards a religious end; where the institution is controlled or directed to a degree so as to enable the religious authorities to propagate and advance—or at least attempt to do so—their religion". In other words, "[t]he question is whether [KJVSD is] controlled or directed by a religious denomination so as to inculcate or attempt to inculcate the doctrine and faith of the denomination" (*supra*, at 467).

Plaintiffs implicitly suggest on appeal that because the Board of Education of KJVSD is elected by residents of the Village, who are undoubtedly Satmarers, it must be presumed that they are advancing their religion through the school. However, plaintiffs have put forth no proof to support this perspective. Moreover, "[m]ere affiliation or a sharing of administrative control by a denomination will not, in and of itself, bring the institution within the proscription of the statute; such a situation cannot be said to have caused religion to so 'pervade' the atmosphere of the [institution] as to effectuate religious control or direction by a religious denomination" (*supra*, at 466). KJVSD submitted the affidavit of the District Superintendent of the Orange-Ulster Supervisory District, whose geographic responsibility includes KJVSD; he asserts that the educational program "is being conducted in a completely secular, religious-neutral manner". The Superintendent of the Monroe-Woodbury School District avers further that direct instruction is being given by secularly dressed teachers to mixed classes of boys and girls; that English is the primary language of instruction; that female teachers are teaching male students; that course materials are secular and nonreligious; that the school facility is secular in appearance without any display of religious indicia; and that no religious subjects are being taught.

In *Matter of College of New Rochelle v Nyguist* (*supra*), this Court determined that a college sponsored by a religious order of Ursuline Nuns was not under the control or direction of a religious denomination; we considered the totality of the cir-

7. In *Grumet v Board of Educ.* (81 NY2d 518, 531-532, *affd* 512 US 687, *supra)*, the Court of Appeals did not reach the State constitutional issue but noted that NY Constitution, article XI, § 3 "is based on a provision significantly different from the Establishment Clause, both in text and history" citing *Judd v Board of Educ.*, 278 NY 200).

cumstances, including the fact that the nuns comprised only one third of the faculty, and determined that the nuns were "not * * * controlled by religious affiliation insofar as their professional and academic activities [were] concerned" (*supra*, at 467). Considering the totality of the circumstances, plaintiffs have not shown that KJVSD is under the control or direction of a religious denomination within the meaning of that clause. Accordingly, the current law does not violate NY Constitution, article XI, § 3.

For the foregoing reasons, I would affirm Supreme Court's judgment. The fact that the current law was an effort to overcome *Kiryas Joel I (supra)* does not render it a sham or an effort to subvert the Establishment Clause. The current law does not endorse religion—facially or in practical effect—i.e., it does not prefer, favor or promote religion (*see, Edwards v Aguillard*, 482 US 578, 593; *Wallace v Jaffree*, 472 US 38, 59-60, *supra*; *Lynch v Donnelly*, 465 US 668, 691, *supra* [O'Connor, J., concurring]).

MIKOLL, J. P., WHITE and CASEY, JJ., concur with MERCURE, J.; SPAIN, J., dissents in a separate opinion.

Ordered that the judgment is reversed, on the law, without costs, summary judgment granted in favor of plaintiffs and it is declared that Laws of 1994 (ch 241) is unconstitutional as violative of the Establishment Clause of the First Amendment of the US Constitution.